## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| *Plaintiff,* | ) | **Civil Action No:** |
| | ) | |
| **v.** | ) | |
| | ) | **Judge:** |
| **David Rausch, Director of the Tennessee** | ) | |
| **Bureau of Investigation, in his official** | ) | |
| **capacity;** | ) | |
| | ) | **Magistrate Judge:** |
| **And,** | ) | |
| | ) | |
| **Jonathan Skrmetti, Attorney General** | ) | |
| **for the State of Tennessee, in his** | ) | |
| **Official capacity;** | ) | |
| | ) | |
| *Defendants.* | ) | |

## COMPLAINT

1. Plaintiff John Doe brings this 42 U.S.C. § 1983 action alleging that Defendants have violated, and continue to violate, Plaintiff's Constitutional rights through retroactive imposition on him of Tennessee's sex offender restrictions and monitoring requirements. Plaintiff seeks declaratory and injunctive relief against the Defendants to protect his constitutional rights.

### <u>PARTIES</u>

2. Plaintiff John Doe is an adult resident of Davidson County, Tennessee.

3. Defendant David Rausch is the Director of the Tennessee Bureau of Investigation, a state agency with a primary enforcement role in Tennessee's sex offender registration scheme.

1

4. Defendant Jonathan Skrmetti serves as the Attorney General and Reporter for the State of Tennessee, a state constitutional office charged with representing the state of Tennessee and its constituent agencies and officials.

## JURISDICTION AND VENUE

5. This Court has federal question jurisdiction over the federal claims in this matter pursuant to 28 U.S.C. § 1331. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendants are state officials whose offices are located in this district.

## FACTUAL BACKGROUND

### A. Plaintiff's Background

6. Plaintiff is a fifty-year-old man, with a fiancée.

7. Plaintiff has a twelve-year-old son, as well as four adult children. Plaintiff also has biological grandchildren, as well as step-grandchildren through his daughter's husband.

8. Pursuant to the "Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act of 2004" (hereinafter "SORVA"),[1] as amended by subsequent legislation, Defendants classify Plaintiff as an "Offender Against Children" for the rest of Plaintiff's life due solely to a single conviction on Plaintiff's record from the year 1994 for the offense of Statutory Rape.

9. Plaintiff has not committed a sex offense in over thirty years, and has not committed any other criminal offense for over twenty years.

10. Plaintiff manages a retail store, takes care of his son, and takes care of his fiancée. Plaintiff was rehabilitated long ago, and is not dangerous.

---

[1] Codified at T.C.A. § 40-39-201 *et seq.*

11. However, based on SORVA's classification of Plaintiff as a "Offender Against Children," SORVA directs that for the rest of Plaintiff's life he be subjected to a pervasive regime of registration, monitoring, reporting, geographic restrictions, child contact restrictions, other restraints, and the ever-present threat of arrest, prosecution, and incarceration for the violation of any of SORVA's obligations or restraints.

12. SORVA and its subsequent amendments were passed many years after Plaintiff committed the offense that resulted in his 1994 conviction.

**B. Legislative History of Tennessee's "Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act of 2004"**

13. In 1994, Tennessee passed its first ever sex offender registry law. However, this law required only that offenders register by mail, and registrants' information was only used for a private law enforcement database.

14. In 1997, Tennessee passed new legislation that made registrants' information public.

15. Tennessee continued expanding the registry laws through the 1990's; however, until 2003 Tennessee's registry regime was largely limited to collecting and reporting information, without imposing significant affirmative obligations or restrictions on those offenders.

16. In 2003, Tennessee amended its then-extant registry regime to exclude those deemed offenders from certain geographic exclusion zones such as schools and childcare centers, with the threat of arrest and criminal prosecution for such offenders should they fail to comply with these exclusion zones.

17. In 2004, Tennessee passed new legislation which repealed its prior registry enactments and replaced them with a new law, effective as of August 1, 2004, entitled the

3

"Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act of 2004" (hereinafter "SORVA").[2]

18. SORVA imposed sweeping new restrictions and obligations on convicted sex offenders, as well as the promise of felony prosecution and a mandatory minimum incarceration sentence for those who failed to comply with the new regime.

19. SORVA defined the "offenders" subject to this regime based solely on the former offender's conviction offense(s), without any assessment or regard for the former offender's present dangerousness.

20. Tennessee has amended SORVA virtually every year since 2004, with virtually every amendment expanding its scope – expanding SORVA's classification categories, adding new restrictions, obligations, and burdens to former offenders' lives, and, for many former offenders, retroactively converting offenders' SORVA obligations to lifelong.

21. In one of the 2007 amendments, Tennessee expanded SORVA to apply retroactively to all former offenders, regardless of how far in the past the former offender's qualifying offense might have been.

22. In its current form, SORVA imposes stringent registration and reporting requirements on former offenders, divides them into statutorily defined classifications, imposes numerous restrictions on where former offenders can live, work, and be, and imposes additional restrictions on former offenders' vocational and expressive activities.

### C. SORVA's offense-based classification system

23. SORVA classifies former offenders as "sexual offenders," "violent sexual offenders," "sexual against children" and "violent against children."

---

[2] Codified at T.C.A. § 40-39-201 *et seq*.

24. All four of these classification categories are based solely on the former offender's offense of conviction. Despite the present tense labels of the classification categories, a former offender's classification category does not in any way take into account the length of time that has passed since a former offender's offense, any treatment or other rehabilitative progress the former offender has completed, the former offender's present or future dangerousness, any assessment of the offender's past dangerousness beyond the fact that they committed the offense(s) they were convicted of, or any other circumstance. Thus, a former offender's actual present dangerousness is essentially irrelevant to his SORVA classification – it is defined solely by the past conviction.

25. For an offender such as Plaintiff, SORVA's classification system results in lifelong "branding" based on a single youthful mistake that happened literally decades ago – in Plaintiff's case, over thirty years ago.

26. SORVA's classifications operate both to stigmatize former offenders and as a means of designating additional burdens and restrictions for those former offenders assigned to categories other than the standard "sexual" classification.

27. The "sexual against children," "violent," and "violent against children" classifications each carry additional obligations and restrictions beyond those required of "sexual" offenders, such as extra reporting requirements, extra prohibitions on being around minors, and – most onerous of all – lifetime subjection to SORVA registration and its attendant stigma, burdens, and obligations.

### D. SORVA'S restrictions, obligations, and criminal punishments

28. SORVA requires former offenders to report to local law enforcement in person to register, either one time every year (for offenders classified as "sexual" or "sexual against

5

children"), or four times every year (for offenders classified as "violent" or "violent against children").

29. Reporting to these registration appointments can be onerous, particularly because law enforcement agencies typically designate a small number of officers, sometimes just one, to manage the registry. Local registrants must work around these officers' schedules in order to report. The SOR officers are not always available, and sometimes leave the law enforcement office without notice to registrants for varying reasons, such as to proactively enforce SORVA on other registrants. Consequently, it is not uncommon for registrants to take time off of work or other obligations to make the trip down to local law enforcement to report, only to have to turn around and make a new plan to report on another day because the SOR officer is not there to take their report.

30. SORVA requires registrants to provide extensive information about their personal and family lives when they report, and to do so truthfully.

31. Failure to provide this mandatory information is punishable as a felony SORVA violation, and failure by the former offender to be truthful with regard to any of this information is punishable as felony perjury.

32. The information that former offenders must provide each time they report is:

   a. The former offender's complete name and all aliases, including, but not limited to, any names that the former offender may have had or currently has by reason of marriage or otherwise, including pseudonyms and ethnic or tribal names.

   b. The former offender's date and place of birth.

   c. The former offender's social security number.

6

d. A photocopy of the former offender's valid driver license; or, if no valid driver license has been issued to the offender, a photocopy of any state or federal government issued ID card issued to the former offender.

e. For a former offender that is on supervised release: the name, address and telephone number of the former offender's probation or parole officer or other person responsible for the former offender's supervision.

f. A list of all sexual offenses or violent sexual offenses that the former offender has been convicted of, the date of each such offense, and the county and state of each such conviction.

g. If the former offender is required to register because of a juvenile offense, the violent juvenile sexual offense for which the former offender has been adjudicated delinquent, the date of the act for which the adjudication was made, and the county and state of each such adjudication.

h. The name(s) of any current employers of the former offender and the length of each such employment, including the physical addresses and phone numbers for each of the former offender's employers.

i. The former offender's current physical address and length of residence at that address, which shall include any primary or secondary residences.

j. The former offender's mailing address, if different from physical address.

k. Any vehicle, mobile home, trailer or manufactured home used or owned by the former offender, including descriptions, vehicle information numbers and license tag numbers for each such vehicle, trailer, or home.

l.  Any vessel, live-aboard vessel or houseboat used by a former offender, including the name of the vessel, description and all identifying numbers.

m.  Name and address of each institution of higher education in this state where the former offender is employed, practices a vocation, or is a student.

n.  Race and gender.

o.  Name, address and phone number of the former offender's closest living relative.

p.  Whether the victims of the former offender's conviction offenses are minors or adults; the number of victims; and the correct age of the victim(s) and of the former offender at the time of the offense or offenses, if the ages are known.

q.  Verification by the TBI, or by the former offender, that the TBI has received the former offender's DNA sample.

r.  A complete listing of the former offender's electronic mail address information, including all usernames, any social media accounts the offender uses or intends to use, instant message, other internet communication platforms or devices, and the former offender's username, screen name, or any other method by which the former offender accesses these accounts or websites.

s.  Whether any minors reside in the former offender's primary or secondary residence.

t.  Any other registration, verification and tracking information, including fingerprints and a current photograph of the former offender, vehicles and vessels, under the standards articulated by the TBI's regulations.

u.  Copies of all passports and immigration documents; and,

v.  Professional licensing information that authorizes a former offender to engage in an occupation or carry out a trade or business.

8

33. SORVA regime requires former offenders to pay annual registration and monitoring fees, much of which goes to pay for local law enforcement's role in SORVA's enforcement and monitoring regime.

34. SORVA requires former offenders to re-report in-person within 48 hours to update their information if any of the information in one of several reporting requirements changes, including employment. This re-report obligation for employment is triggered by even minor alterations to an existing job, such as a change of shift.

35. SORVA requires former offenders to report any new or altered email addresses and/or social media usernames within 72 hours.

36. SORVA requires former offenders to always carry their state-issued identifications with them, which must designate the former offender as a registered sex offender.

37. SORVA imposes numerous intrusive restrictions on where former offenders can live, work, and exist. Regardless of whether the former offender's victim was a minor or not, SORVA prohibits all former offenders from the following:

   a. Working or residing, or maintaining a "secondary residence" within 1000' of a school, day care center, other childcare facility, public park, playground, recreation center, or public athletic field;

   b. Residing within 1000' feet of the victim from the former offender's criminal case, or any of the victim's family members;

   c. Going within 100' of the victim from the former offender's criminal case;

   d. Contacting the former offender's victim without their consent;

e.  Entering or remaining on the premises of any school, day care center, other childcare facility, public park, playground, recreation center, or public athletic field when there is reason to believe that children may be present, unless:

   i.  dropping off or picking up the former offender's own child at school after having given written notice to the school's principal; or

   ii.  attending a conference with officials at a school, day care, child care, recreation center, or playground with written permission from the administrator to do so.

f.  "Stand[ing], sit[ting] idly, or remain[ing]" within 1000 feet of the "property line" of any building owned or operated by any school, day care center, childcare facility, public park, playground, recreation center, or public athletic field when children under 18 are present "while not having a reason or relationship involving custody of or responsibility for a child or any other specific or legitimate reason for being there;"

g.  Being within any vehicle owned, leased, or contracted by a school, day care, childcare, or recreation center when children under 18 years of age are present;

h.  Residing with two or more other former offenders;

i.  Being "alone with" any minor in a "private area." SORVA defines "alone with" to include scenarios in which another adult is present but is asleep or otherwise unavailable, and "private area" to include places such as hotels and motels;

38. SORVA imposes additional lifelong child contact restrictions on former offenders whose victims were minors.

10

a. SORVA prohibits such former offenders from residing with any minors, or even from having an overnight visit in a place in which a minor is present. This can even include the former offender's own children, if:

    i. The former offender's parental rights are in the process of being terminated;

    ii. The former offender's past sexual offense was committed against any of his children, including a child who is now an adult;

    iii. The former offender's sexual offense victim was under the age of 13 at the time of the offense, and a court has found by clear and convincing evidence that the offender poses a danger of substantial harm to the minor.

b. SORVA also prohibits such former offenders[3] from:

    i. "Pretend[ing] to be, dress[ing] as, or otherwise impersonat[ing]" a real or fictional person or character "or a member of a profession, vocation, or occupation" in the presence of a minor or with the intent to attract a minor to be in the presence of the former offender;

    ii. Engaging in employment, a profession, or a vocation, regardless of whether compensation is received, that the offender knows or should know will cause the offender to be in direct or unsupervised contact with a minor; or,

    iii. Operate any specific type of vehicle for the purpose of attracting a minor to be in the presence of the former offender.

---

[3] This enactment is codified at T.C.A. § 40-39-215. Unlike other SORVA violations, the prohibitions described in this paragraph are punishable as a Class A misdemeanor, carrying up to 11 months, 29 days incarceration.

iv.  Renting, or offering to rent, a swimming pool, hot tub, or body of water that is on property owned by the former offender.

39. SORVA authorizes public libraries to banish former offenders from their premises.

40. SORVA authorizes Tennessee's municipal governments to establish "community notification systems" to alert the public should a former offender indicate his intention to move to the municipality.  SORVA further authorizes municipalities to charge former offenders up to $50 per year toward the cost of such community notification systems.

41. SORVA deprives former offenders of the ability to legally change their names, except through marriage, divorce or annulment, or being adopted.[4]

42. SORVA prohibits Tennessee's Medical Board from licensing former offenders classified as "violent sexual offenders" from serving as medical providers at all.[5]

43. While SORVA theoretically allows the Medical Board to license former offenders classified as "sexual offenders" as medical providers, in order for "sexual offenders" to obtain and/or maintain a medical license such former offenders must be subjected to a Medical Board hearing.  If the Medical Board finds that the former offender is a risk to patients, the board must deny and/or revoke the former offender's license.  If the Medical Board finds that the former offender is not a risk to patients, the board may license the provider but must still nonetheless prohibit the provider from "engaging in direct patient care or contact." The Medical Board is also required to impose whatever additional restrictions "the board deems advisable" on the former offender.

44. SORVA criminalizes any violation of its obligations and restrictions, making almost all such violations punishable as a class E felony.  SORVA violations carry a 1 – 6 year-

---

[4] This enactment is codified at T.C.A. § 29-8-101.
[5] This enactment is codified at T.C.A. § 63-6-240.

prison sentence and a mandatory 90-day incarceration on a first offense, a mandatory

180-day incarceration on a second offense, and a mandatory 1-year incarceration on a

third or subsequent offense.

**E. The TBI maintains a Central Repository of Former Offenders' SORVA Information**

45. The TBI maintains a centralized information registry database which maintains all of the

information reported about each former offender.

46. The TBI provides online access to Tennessee's local law enforcement agencies, so that

the local agencies can transmit the information they collect about former offenders to the

TBI's centrally-maintained registry database.

47. The TBI maintains the data files for each former offender in its system for the lifetime of

the former offender.

48. The TBI also maintain a copy of each and every reporting form that has been turned in

for each former offender, preserving those until the former offender's death as well.

**F. The TBI Classifies Former Offenders Pursuant to SORVA**

49. Relying on the information in its central repository, the TBI classifies former offenders

into SORVA's classification categories of "sexual," "sexual against children," "violent,"

and "violent against children".

50. There is no process by which a former offender can appeal a TBI classification

determination.

51. Moreover, the TBI exercises discretion to alter a former offender's classification as the

TBI sees fit. On information and belief, there have been many instances over the years in

which the TBI has originally classified a former offender as "sexual," leading that former

offender to believe that he will be able to petition for termination of his registry

13

obligations after he completes a ten-year term, only to subsequently change that classification to one of the lifetime-registration categories once the former offender finally submits his TBI petition after having successfully completed his ten-year term.

52. The TBI disseminates its classification determinations to Tennessee's local law enforcement relevant state agencies, and directs these agencies to treat former offenders in accordance with their classification status.

**G. The TBI Publishes Former Offenders' SORVA Information to the Public**

53. The TBI maintains a "Tennessee Sex Offender Registry" website.

54. The website publishes the following information about each registrant:

    a. Name;

    b. SORVA Classification;

    c. Status (either "active" or "inactive");

    d. Date of birth;

    e. Full criminal history;

    f. Residential address;

    g. Race and gender;

    h. Last date of information verification;

    i. Most recent photograph submitted to TBI;

    j. Driver's license and/or state identification number;

    k. Physical description, including height, weight, eye color, hair color, tattoos, scars, and marks;

    l. Criminal history, including the date of all arrests and convictions, probation and/or parole status, and the existence of any outstanding warrants;

14

m.  Employer(s)' address(es);

n.  License plate number(s) and description(s) for each of the registrant's vehicle(s).

55. "Inactive" registration status does not exist in the SORVA statute, which by its terms applies only to former offenders who maintain at least a "secondary residence" in Tennessee. Thus, the SORVA statute itself contemplates that registrants who relocate completely away from Tennessee should just be removed from the registry.

56. However, on information and belief the TBI created "inactive" SORVA registration status in order to have a system for keeping the information on registrants who have moved away from Tennessee in the registry and on the website.

57. The TBI's written policies state that inactive status should be used only for those former offenders who "frequently visit[] Tennessee, moves away, and continue[] to return."

58. However, on information and belief, in practice the TBI converts all registrants who relocate away from Tennessee to "inactive" status rather than removing their records as contemplated by SORVA, regardless of whether there is any reason to expect the former offender to frequently return to Tennessee.

59. Thus, the TBI continues branding registered former offenders who move away from Tennessee in perpetuity, even beyond the scope that SORVA authorizes or requires.

**H.  The TBI Leads Tennessee's Statewide SORVA Enforcement Regime**

60. The TBI disseminates former offenders' registration status to the Federal Bureau of Investigation's National Crime Information Center ("NCIC").  In turn, NCIC then includes a remark on the former offender's NCIC report reflecting that the former offender is a "Registered Sex Offender" in "Tennessee."

15

61. The TBI conducts state and federal criminal record checks on all registrants to determine whether they have committed any other offenses. If the TBI determines that the offender has committed an offense, the TBI refers this information to local law enforcement so that the registrant can be prosecuted.

62. The TBI routinely works directly with local, state, and federal law enforcement agencies to proactively enforce SORVA.

63. The TBI routinely partners with federal, state, and local law enforcement agencies to conduct "compliance check" operations on registered offenders in a given community. The TBI then trumpets these efforts to the media.

64. The TBI's annual reports indicate that the TBI has a "Sex Offender Registry" section that includes six intelligence analysts and one temporary employee. The reports indicate that the TBI's Sex Offender Registry unit fulfills the following functions:

> The TBI SOR unit serves and assists Tennessee law enforcement agencies including sheriff's offices, police departments, the Tennessee Department of Correction, as well as out-of-state agencies. The TBI SOR unit not only oversees the state sex offender database, but provides training and support to registering agencies, ensures accuracy of sex offender classifications and registrations, manages federal grant projects, issues SOR notifications to the public and law enforcement, conducts file audits, removes deceased offenders from the registry, and reviews sex offender terminations.

65. The TBI's annual reports indicate that the TBI has trained hundreds of local law enforcement officers on SORVA, and that one of the TBI's training programs – which as of the TBI's 2021 report, had been completed by over two hundred law enforcement officers – is about "SOR Compliance Operations." According to the TBI's annual report, this training "gives SOR agencies information and tools for conducting sex offender compliance operations."

16

66. The TBI annual reports go on to state that "TBI analysts assist with SOR compliance operations across the state." The reports then state:

> TBI compliance checks are joint operations with multiple law enforcement agencies including TBI, registering agencies, and the U.S. Marshals Service. TBI analysts create intelligence packets on each registered offender for the operations which contains a copy of the most recent SOR registration form, criminal record/warrant check, and DL information. During the compliance checks, law enforcement will make contact with each registered sex offender and verify their offender information, including residence, vehicles, employment, and compliance with any offender restrictions (i.e. children present, computers/internet, and firearms) when applicable. If a registered offender is found in violation of SOR rules, warrants are obtained by the registering agency.

67. In the TBI's 2021 – 2022 annual report, the TBI trumpeted the fact that, "During this fiscal year, four local agencies completed compliance operations that resulted in law enforcement making contact with 145 offenders to verify compliance and 14 arrest[s]."

68. The TBI's annual reports also state that one of the TBI's analysts oversees the TBI's "absconder project," which "provide[s] strategic planning and operational oversight for state and local law enforcement efforts to locate, arrest, and reduce the population of 672 at-large non-compliant sex offenders classified as absconders on the Tennessee Sex Offender Registry."

69. The 2021 – 2022 TBI report proudly declared that in that year, the TBI's Absconder Project had led to the arrests of four "non-compliant sex offenders."

70. The TBI's registry website contains a section on the home page labeled "Help Us Find These Wanted Violators." Below that heading, the site says, "The TBI seeks information about the sex offenders listed below, who are in violation of the state's Sex Offender Registry laws." This is followed by a row of former offender profiles with names, pictures, qualifying sex offenses, and last known whereabouts.

17

71. The TBI routinely utilizes its social media platforms to advance and celebrate its SORVA enforcement goals and accomplishments.

72. Some of the TBI's social media posts focus on notifying the public of individual wanted SORVA violators, providing the name and picture of the alleged violator as well as the name and phone number for the relevant local law enforcement agency. These posts invite the public to call in information about the alleged violator should someone see him.

73. Other posts celebrate the TBI's direct role in conducting joint SORVA compliance operations with local, state, and federal law enforcement agencies.

74. For instance, on August 22, 2024, the TBI posted a social media post proudly proclaiming the TBI's recent efforts to conduct an "offender compliance operation" with the Giles County Sheriff's Office and the Pulaski Police Department. The post indicated that the compliance operations had resulted in three arrests for SORVA violations, one of which was for a "living restriction" violation. The post stated that it was the seventh such joint compliance operation that the TBI had collaborated with law enforcement agencies on in the year 2024.

75. The TBI publishes "Standard Operating Procedures" that purport to give mandatory directives to local law enforcement in the enforcement of SORVA.

76. TBI's analysts and attorneys also counsel local law enforcement agencies regarding the scope of the enforcement rules and in interpreting SORVA. In at least one instance the TBI's interpretive advice resulted in local law enforcement advising a registered, compliant former offender that he was prohibited from exercising his court-ordered joint-custodial parenting time with his own child, even though the former offender's victim

18

had been over the age of 12 at the time of the offense and the victim was not the former offender's child.

## I. **SORVA's Specific Impacts on Plaintiff**

77. SORVA has significantly interfered with Plaintiff's life since its inception, and continues to do so to this day.

78. Regardless, under SORVA Plaintiff remains subject to lifetime classification as an "offender against children" based solely on his 1994 conviction, with no regard for the man he has become since his offense.

79. Because of Plaintiff's registry status and classification, Plaintiff lives in a near-constant state of fear, always worrying about people in his life finding out about his status and then and judging him and his family because of it. In Plaintiff's experience, once people find out his status they treat him like he is "the worst thing in the world."

80. Because of Plaintiff's registry status, and in particular SORVA's geographic exclusions, Plaintiff and his family have struggled to maintain housing. Plaintiff is prohibited from living in most apartment complexes because of the children residing in them. Plaintiff previously tried to buy a house, went through the whole process, put an offer on, and then suddenly found out that he could not buy it because someone had registered an unmarked daycare inside their own home, which was about 900 feet from the home Plaintiff was trying to buy. The sale fell through. Ultimately, Plaintiff and his children ended up having to reside with Plaintiff's fiancée's family. Plaintiff feels that he has no real freedom to move, because it is so difficult to find a place that does not violate SORVA's geographic restrictions, and that once he finds a place that he and his family can stay he is essentially compelled to remain there.

81. Because of SORVA and Plaintiff's registry status, it has been very difficult for Plaintiff to maintain employment and advance his career. Plaintiff has lost multiple jobs because of SORVA, after someone discovered that Plaintiff was on the registry. Plaintiff worked for a company for several years back in the period 2000 – 2005, working his way up to being a driver for the company. Plaintiff worked hard, and was doing well. However, one day someone saw Plaintiff's information in a magazine that published SORVA records and called it into the company. Because of that call, Plaintiff lost the job. Plaintiff has attempted to work for both FedEx and UPS, and was turned down by both because of SORVA. At UPS, Plaintiff could not even get a job unloading trucks. The manager he applied with actively advocated for him to be hired; however, corporate leadership refused to offer him the job because of SORVA.

82. Plaintiff at one time hoped to obtain his commercial driver's license and obtain work in that field, but was declined admission to the CDL program. Plaintiff was also told that it would not be worth his time and money regardless, because no one would hire him.

83. Plaintiff does have current employment, and his current employer is aware of Plaintiff's SORVA status and accepts it. However, because of SORVA Plaintiff's employer has to restrict Plaintiff's contact with minor employees, which is a burden on both Plaintiff and his employer. Plaintiff also recently lost an opportunity to take a higher paying job at a different company because of his SORVA status.

84. SORVA has had a severe negative impact on Plaintiff as a father, and on Plaintiff's children. Plaintiff cannot attend his children's school events, athletic events, and extracurricular events.

85. Plaintiff's youngest son attends a private middle school which Plaintiff works very hard to pay for, and recently made the middle school basketball team. Plaintiff's son has basketball games about twice a week, but because of SORVA Plaintiff cannot attend the games. This is heartbreaking for Plaintiff, and hard on his son. It tears Plaintiff's son up that his father cannot go see his games. Plaintiff's fiancée goes to the games for him, and she tries to take videos so Plaintiff can watch. But, it is not the same – not for Plaintiff, and not for his son. Plaintiff missed his older kids' games until they made it to college, and now he is having to go through it again with his youngest son. Plaintiff's son has offered to quit sports so that sports do not separate him from his father – but of course as a father Plaintiff has insisted that his son have the normal, healthy adolescent experiences he wants to have, even if Plaintiff cannot share them with him.

86. Because of SORVA Plaintiff's son cannot have his friends sleep over, and Plaintiff must avoid being alone with Plaintiff's son's friends. It is extremely hard on Plaintiff's son to have so many social restrictions because of something Plaintiff did decades before his son was ever born.

87. Recently, Plaintiff's son's teacher asked Plaintiff to come to the school for a parent-teacher conference. Plaintiff never goes into the school, he just picks his son up and never leaves his car. The only time Plaintiff has actually gone inside was because the school faculty had specifically asked to see him. However, even under those circumstances Plaintiff's registry officer told him that the school staff could have gotten Plaintiff arrested for a SORVA violation – even though they asked him to come inside.

88. Plaintiff struggles with uncertainty about whether basic things are permitted. For instance, Plaintiff is still uncertain about whether he can take his son to a pediatrician, since there are children present in the office.

89. Plaintiff has an adult son, aged 24, who is still impacted by Plaintiff's SORVA status even as an adult. Plaintiff's son had a girlfriend that he valued, with a healthy relationship. However, the girlfriend recently found out about Plaintiff's registry status, and because of it ended up breaking up with Plaintiff's son.

90. Plaintiff has a grandson in Oklahoma that Plaintiff cannot see because he is too scared of being arrested. Plaintiff's daughter serves in the United States Navy, and is stationed in Oklahoma City. She has her own biological children, as well as step kids with her husband. SORVA prohibits Plaintiff from being with the stepchildren, because they are not Plaintiff's biological family. Consequently, Plaintiff feels that he just cannot go to Oklahoma to visit with his daughter and her family.

91. Plaintiff routinely struggles with anxiety over the possibility that he could be arrested for a minor, technical, or unintentional SORVA violation. It is very difficult for Plaintiff to stay on top of the numerous requirements, obligations, and restrictions. One little mistake can mean an arrest, felony prosecution, and incarceration. For instance, several years ago Plaintiff's car broke down right when it was time for Plaintiff to report. Plaintiff's registry officer was sympathetic, and allowed him extra time to report. However, Plaintiff still ended up having to miss a day of work to report. Plaintiff ended up having to replace his vehicle altogether, and thus had to report again to report the new vehicle. However, Plaintiff could not miss work again to report (again) after having just having missed it, and so he missed the 24-hour "new vehicle" reporting requirement. Plaintiff's

enforcement officer did not end up arresting him, but he could have. The experience was harrowing, and left Plaintiff with lasting anxiety about the difficulties of compliance.

92. Because of Plaintiff's registry status, and its attendant geographic and child contact restrictions, Plaintiff's mental health suffers. Plaintiff feels bad about himself for not being able to take his kids to places geared toward children, and for having to miss his children's school, athletic, social, and other extracurricular events. Plaintiff does his best to be a family man, but SORVA makes it extremely difficult to fulfill his role. At one point, Plaintiff contemplated suicide because he started to believe that it would be better for everyone if he were to just remove himself from their lives. Plaintiff's older son is constantly angry about what the registry has done to him and his family, and his had to attend counseling to help address these issues. Plaintiff feels paranoid any time that he is in a place where children are, such as restaurants, because he is worried about someone potentially bringing up Plaintiff's registry status should a child try to interact with him.

93. Plaintiff tends to keep to himself in his own "bubble" to avoid problems with other people over his registry status. He feels that the registry affects everything in his life, and that he has to watch everything he does. Plaintiff stays constantly hypervigilant. If he drives past a park, he gets nervous. He feels that he has to shut himself from the whole world to try to stay compliant. Plaintiff just works, goes home, and keeps to himself.

94. Plaintiff experiences "spam" call threats because of his registry status. People call and tell Plaintiff that he has to pay them money because he supposedly has registry violation warrants. Plaintiff's supervising registry officers have told Plaintiff that these are scams, but, they are stressful to receive regardless. The callers claim that Plaintiff has a warrant,

and they are able to say where Plaintiff lives and works – information that is publicly

available because of the registry.  It is always scary for Plaintiff when this happens.

95. Due to these and a host of other impacts over the course of the past decades, and the

continued impacts that Plaintiff suffers with each passing day, Plaintiff seeks court-

ordered relief from being subjected to SORVA enforcement.

**J.  The Attorney General's Role in Tennessee's Constitutional Scheme**

96. The Tennessee Constitution sets out the office of the Attorney General and Reporter

("Attorney General") as a state constitutional office, with the Attorney General to be

appointed by the state supreme court and to hold office for an eight-year term.

97. The Tennessee Attorney General functions as the state of Tennessee's law office.  As

described on the Attorney General's website, the office is engaged in "Making the Case

for Tennessee."

98. As interpreted by Tennessee's Supreme Court, any state court proceeding in Tennessee

seeking a declaratory judgment to the effect that a Tennessee statute is unconstitutional

must name the Tennessee Attorney General in his official capacity as a party.

**K.  The Local Law Enforcement Role in Enforcing SORVA**

99. Local law enforcement agencies play a significant role in enforcing SORVA, both in

terms of the collection of information, the reporting of that information to the TBI, and

the enforcement of SORVA's restrictions and obligations.

100.      On information and belief, in the present policy environment all law enforcement

agencies in Tennessee take their lead on which former offenders to treat as subject to

SORVA enforcement from the TBI and NCIC.

24

101. If the TBI lists a former offender on the registry, local law enforcement agencies will treat the former offender as subject to SORVA and will enforce SORVA's various restrictions on the former offender accordingly.

102. If the TBI shows a former offender as not subject to registration, local law enforcement agencies will not enforce SORVA's restrictions on the offender.

## CLAIMS FOR RELIEF

### COUNT I: EX POST FACTO VIOLATION IN VIOLATION OF ARTICLE I, § 10 OF THE U.S. CONSTITUTION (42 U.S.C § 1983)

### (ALL DEFENDANTS)

103. Plaintiff hereby reincorporates paragraphs 1 – 102 by reference.

104. As applied to Plaintiff, each of the SORVA enactments that was passed after Plaintiff's qualifying offense constitutes "punishment" within the meaning of the ex post facto clause of Article I, § 10 of the U.S. Constitution, and is thus unconstitutional.

105. Defendant Rausch is a proper official capacity defendant because Rausch is the Director of the TBI, the agency that exercises the primary role in SORVA's classification regime and the lead role in SORVA's enforcement regime.

106. Plaintiff is entitled to injunctive relief from SORVA, to protect his *ex post facto* rights from further infringement by Defendant Rausch and the TBI.

107. Defendant Skrmetti is a proper official capacity defendant because the Tennessee Attorney General and Reporter is the proper entity to sue when seeking a declaration that a Tennessee statute is unconstitutional.

25

108.     Plaintiff is entitled to declaratory relief against Defendant Skrmetti, with a

declaration that SORVA and each of its subsequent amendments is unconstitutional as

applied to Plaintiff because of his constitutional right against *ex post facto* punishment.


### COUNT II: DUE PROCESS
### (42 U.S.C § 1983)

#### (ALL DEFENDANTS)

109.     Plaintiff hereby reincorporates paragraphs 1 – 102 by reference.

110.     Much, if not all, of SORVA constitutes an unconstitutional violation of Plaintiff's

constitutional *ex post facto* rights.

111.     Those provisions of SORVA that are *ex post facto* as applied to Plaintiff are void

as a matter of federal constitutional law.

112.     Although numerous federal courts have held that much of SORVA constitutes

"punishment" within the meaning of the *ex post facto* clause, the federal courts have not

yet conclusively determined which provisions are "punitive" and which might be

considered "regulatory."  Consequently, as of the date this amended complaint is filed it

is not reasonably possible for anyone, much less Plaintiff, the TBI, or local law

enforcement to determine which parts of SORVA do or do not apply to Plaintiff.

113.     Because it is not reasonably possible for Plaintiff or for law enforcement to

ascertain which sections of SORVA apply to Plaintiff at this time, application of any of

SORVA's registration obligation to Plaintiff will result in Plaintiff being subjected to

unconstitutionally vague SORVA enforcement provisions, wherein Plaintiff does not

know what he can or cannot do without being arrested and law enforcement does not know what it can or cannot arrest Plaintiff for.

114.     Defendant Rausch is a proper official capacity defendant because Rausch is the Director of the TBI, the agency that exercises the primary role in SORVA's classification regime and the lead role in SORVA's enforcement regime.

115.     Plaintiff is entitled to injunctive relief from SORVA, to protect his Due Process rights from further infringement by Defendant Rausch and the TBI.

116.     Defendant Skrmetti is a proper official capacity defendant because the Tennessee Attorney General and Reporter is the proper entity to sue when seeking a declaration that a Tennessee statute is unconstitutional.

117.     Plaintiff is entitled to declaratory relief against Defendant Skrmetti, with a declaration that SORVA is unconstitutional as applied to Plaintiff because of his constitutional right to Due Process.


### COUNT III: CIVIL CONSPIRACY
### (42 U.S.C § 1983)

### (ALL DEFENDANTS)

118.     Plaintiff hereby reincorporates paragraphs 1 – 102 by reference.

119.     As applied to Plaintiff, each of the SORVA enactments that was passed after Plaintiff's qualifying offense – which is all of them – constitute "punishment" within the meaning of the ex post facto clause of Article I, § 10 of the U.S. Constitution, and are thus unconstitutional.

120.     Moreover, because it is not reasonably possible at this time to discern which parts of SORVA can be enforced on Plaintiff without violating his *ex post facto* rights, application of any of SORVA to Plaintiff violates his right to federal Due Process.

121.     Defendant Rausch is a proper official capacity defendant because Rausch is the Director of the TBI, an agency with a lead role in enforcing Tennessee's SORVA regime.

122.     Director Rausch and the TBI cooperate extensively with Tennessee's local municipal law enforcement agencies, as well as other state and federal agencies, to proactively enforce SORVA and its attendant restrictions and obligations.

123.     Defendant Skrmetti is a proper official capacity defendant because the Tennessee Attorney General and Reporter is the proper entity to sue when seeking a declaration that a Tennessee statute is unconstitutional.  In addition, on information and belief Defendant Skrmetti's office is proactively involved in applying pressure to local municipal law enforcement agencies to enforce the whole of SORVA on all former offenders, notwithstanding the *ex post facto* clause or any other constitutional limitations.

124.     Director Rausch and the TBI provide training, logistical support, planning, and special agents to assist local law enforcement agencies to identify, locate, and arrest alleged SORVA violators.

125.     Through the TBI's Standard Operating Procedures and other directives to local law enforcement agencies, the TBI and those agencies participate in the common plan of enforcing the whole of SORVA notwithstanding the limits set by the U.S. constitution.

126.     The Director, the TBI, Defendant Skrmetti, his office, and their local municipal law enforcement cohorts all share in the common objective of enforcing SORVA on former offenders whose qualifying offenses predated it, despite the Director and his

28

cohorts' knowledge that their actions will result in the violations of these former offenders' constitutional rights.

127.     The Director, the TBI, Defendant Skrmetti, his office, and their local law enforcement cohorts all take a wide variety of overt acts in furtherance of their conspiracy to violate the constitutional rights of former offenders whose qualifying sex offenses predated SORVA.

128.     The Tennessee law enforcement conspiracy to enforce SORVA on former offenders whose qualifying offenses predated SORVA has resulted in severe injuries to many former offenders, including Plaintiff as articulated herein.

129.     Plaintiff is entitled to injunctive relief to protect his constitutional rights from further infringement by Defendant Rausch, the TBI, Defendant Skrmetti, the Attorney General's Office, and Defendants' local municipal law enforcement co-conspirators.

## REQUEST FOR RELIEF

WHEREFORE, these premises considered, Plaintiff prays:

1. That the Defendants Answer this Complaint within the time provided by law.

2. That the Court issue a preliminary injunction enjoining Defendant Rausch from enforcing Tennessee's SORVA regime against Plaintiff generally, and in particular from subjecting Plaintiff to SORVA's classification regime, for any offenses committed prior to SORVA's enactment.

3. That judgment for Plaintiff enter against the Defendants on each count.

4. That the final judgment permanently enjoin Defendant Rausch from enforcing Tennessee's SORVA regime against Plaintiff generally, and in particular from subjecting Plaintiff to SORVA's classification regime, for any offenses committed prior to SORVA's enactment.

5. That the Court enter a declaratory judgment against Defendant Skrmetti declaring that SORVA is unconstitutional as applied to Plaintiff.

6. That Plaintiff be awarded his attorney's fees and reasonable litigation expenses, including expert witness fees, pursuant to 42 U.S.C. § 1988 and F.R. Civ. Pro. 54(d).

7. That the court costs in this matter be taxed to Defendants.

8. That Plaintiff be awarded all other relief to which it may appear he is entitled in the interests of justice.

Respectfully submitted,

*s/ Kyle Mothershead*
*s/ Aaron Rothbaum*

Kyle Mothershead, BPR 22953
Aaron Rothbaum, BPR 36572
Relentless Advocacy, PLLC
7000 Executive Center Drive, Suite 240
Nashville, TN 37027
T: (615) 891-3901 / F: (615) 229-6387
E: kyle@relentlesslaw.com
E: aaron@relentlesslaw.com